```
                    IN THE UNITED STATES DISTRICT COURT
 1                 FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION
 2
      UNITED STATES OF AMERICA,   )    Case No. 3:18-cr-00356-S
 3                                )
                 Plaintiff,       )    Dallas, Texas
 4                                )    October 31, 2018
      v.                          )    9:30 a.m.
 5                                )
      THOMAS D. SELGAS (01),      )
 6    MICHELLE L. SELGAS (02),    )    JOINT MOTION TO MODIFY
      JOHN O. GREEN (03),         )    CONDITIONS OF RELEASE [#30]
 7                                )
                 Defendants.      )
 8    _____)

 9                     TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE REBECCA RUTHERFORD,
10                 UNITED STATES MAGISTRATE JUDGE.

11    APPEARANCES:

12    For the Government:          Robert A. Kemins
                                   U.S. DEPARTMENT OF JUSTICE, TAX
13                                    DIVISION
                                   717 N. Harwood Street, Suite 400
14                                 Dallas, TX  75201
                                   (214) 880-9781
15
      For Defendant T. Selgas:     Franklyn Ray Mickelsen
16                                 BRODEN & MICKELSEN the
                                   2600 State Street
17                                 Dallas, TX  75204
                                   (214) 720-9552
18
      For Defendant Green:         Michael Louis Minns
19                                 LAW OFFICE OF MICHAEL LOUIS MINNS
                                   9119 S. Gessner, Suite One
20                                 Houston, TX  77074
                                   (713) 777-0772
21
      Recorded by:                 Lavenia Price
22                                 UNITED STATES DISTRICT COURT
                                   1100 Commerce Street, Room 1452
23                                 Dallas, TX  75242-1003
                                   (214) 753-2168
24

25
```


DEFENDANT'S EXHIBIT

1    Transcribed by:              Kathy Rehling
                                  311 Paradise Cove
2                                 Shady Shores, TX   76208
                                  (972) 786-3063
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
            Proceedings recorded by electronic sound recording;
25            transcript produced by transcription service.

1            DALLAS, TEXAS - OCTOBER 31, 2018 - 9:38 A.M.

2          THE COURT:  Good morning.

3          MR. KEMINS:  Good morning, Your Honor.

4          MR. MICKELSEN:  Good morning, Your Honor.

5          MR. MINNS:  Good morning, Your Honor.

6          THE COURT:  Happy Halloween.  Please have a seat.

7          A VOICE:  We're all dressed as lawyers for Halloween.

8          THE COURT:  Yes.  Have you already arranged

9   yourselves with one case at the bench already, it looks like?

10          MR. MINNS:  Yes, Your Honor.

11          A VOICE:  If you want -- if we're in the wrong order,

12   we'll get in the back of the room.

13          THE COURT:  It's okay.  I can easily -- I just do

14   like this.  It won't change the order.  So you guys are United

15   States of America versus Selgas, et al., 3:18-cr-356-S?

16          MR. KEMINS:  Correct, Your Honor.  Robert Kemins for

17   the United States, ma'am.

18          THE COURT:  Thank you.

19          MR. MINNS:  Michael Minns for John Green, Your Honor.

20          MR. MICKELSEN:  And Mick Mickelsen for Mr. Selgas.

21          THE COURT:  Good morning.

22          MR. MICKELSEN:  Good morning.

23          THE COURT:  All right.  The last -- I checked the

24   docket and I did not see a -- was there a -- I see the joint

25   motion and I just wanted to make sure that -- I wanted to know

4

1  the Government's response.

2          MR. KEMINS:  Your Honor, we, as I told Mr. Minns'

3  office, we don't object to them meeting with their counsel --

4          THE COURT:  Uh-huh.

5          MR. KEMINS:  -- as long as the counsel is there in

6  some version.  We're not going to demand that they all be in

7  the same -- sitting in the same room, but if they could do it

8  by conference call or videoconference.  We just don't -- are

9  not comfortable within a conspiracy case the three defendants

10  meeting together unsupervised without their lawyers.  So we

11  don't object to them, you know, if the lawyers see fit to help

12  with the defense or anything, we certainly don't want to

13  deprive them of a strategy.

14      I think the other main issue in the motion that was filed

15  was a -- Mr. Green was still holding some funds that belonged

16  to the Selgases in his IOLTA account.  And we told Mr. Minns'

17  office we would not object to a one-time transfer of funds

18  from Mr. Green's IOLTA account back to the Selgases, because

19  it was intimated that that was impacting on the Selgases'

20  ability to pay for their defense.

21      Certainly, our argument -- I know there are some

22  differences as to what it all actually means -- but the

23  continuing, the ongoing payment of the Selgases' bills from

24  Mr. Green's IOLTA account would be violations of the

25  conditions of release and in fact may be more overt acts in a

1    continuing conspiracy.  But we would not object to a one-time

2    bulk transfer of the money back from Mr. Green to the

3    Selgases.

4         THE COURT:  Okay.  So the footnote on the certificate

5    of conference says -- and it's okay to proceed informally.  I

6    appreciate the courtesy of standing, but I think, as we sort

7    of have a little give-and-take, it's perfectly all right with

8    me if you just speak from the table.  As long as your voice is

9    picked up by the microphone, --

10        MR. KEMINS:  Yes, ma'am.

11        THE COURT:  -- it'll be on the record and that'll be

12   just fine.

13     So the footnote to the certificate of conference says the

14   Government does not oppose the Defendants meeting together in

15   the presence of counsel.

16        MR. KEMINS:  In the presence of counsel.  That's

17   correct.

18        THE COURT:  The Government does oppose Defendants

19   meeting without counsel?

20        MR. KEMINS:  That is correct.

21        THE COURT:  And then the Government is not opposed to

22   tendering the entire amount of the IOLTA account to the

23   Defendants in a one-time transfer?

24        MR. KEMINS:  Correct, Your Honor.

25        THE COURT:  Okay.  Is that the Defendants'

1   understanding as well?

2          MR. MINNS:  Your Honor, yes, Your Honor, it's -- but

3   I think we have some significant disputes.  The Government has

4   been very easy to negotiate what we agree on and what we

5   disagree on, and I think we have a collegial relationship on

6   it, but the disagreements are substantial, and that's -- and I

7   -- when the Court is ready, I'd like to address those

8   disagreements.

9          THE COURT:  Do you believe that there is a greater

10  area of disagreement other than the Government's objection to

11  the Defendants meeting without counsel, or are we limited to

12  that --

13         MR. MINNS:  No, we also need -- we also want the

14  ability -- well, let me give you an example.  My client is

15  best friends with a church member.  We don't know if he's a

16  witness or not.  We think he should be a witness and he should

17  be given immunity.  He's awkward talking to him at church.  He

18  feels like he can't without possibly broaching the order.  So

19  he comes up to him and he walks away with no explanation

20  whatsoever, which also creates some sort of mystery and

21  problem.

22     So, my client is a practicing attorney.  This is an

23  extraordinarily substantial and interesting case with

24  interesting idiosyncrasies in it, and I believe -- and I'll be

25  corrected if I'm wrong; I haven't gone through the paperwork

1   -- there's over 40,000 pages of papers.  So my client lives in

2   Idaho.  Some of the witnesses are in Idaho.  Some of the

3   witnesses are in Texas.  We haven't exchanged witness lists.

4   We've -- both sides agreed to a continuance because of the

5   complexity of the case.  But he's restricted, really, from

6   assisting on his own case.  If he was pro se, he wouldn't be.

7   So he's being punished, really, for hiring me.  If he was pro

8   se, he would be allowed to talk to witnesses and prepare.

9        And there are very good reasons why -- I mean, there's

10  people that are dangerous.  You know, they have to be

11  restricted.  There's people that are doing other things that

12  have to be restricted.  We don't agree that there's an illegal

13  conspiracy, but if the Government is correct and -- then we're

14  not doing any of the things they accused us of doing anyway.

15  And I can't see what -- it will make the financing of this

16  case insane.  We have a client -- the other defendant was

17  working with the client.  They're partners in a business,

18  which can't be -- my client can't participate in that

19  business.

20       It has nothing to do with taxes.  They do patent research,

21  and his partner owns 99 percent, my client owns 1 percent, but

22  these patents have been worth millions and millions of

23  dollars.  So they can't coordinate, they can't work their

24  business.  One's in Texas, one's in Idaho.  All the lawyers

25  are in Texas.  There are no direct flights directly to where

1   my client lives in Idaho.  If they can't do anything -- his

2   client also has my client's legal files, and he has not gotten

3   them.  And we need to work something out so that they can

4   trade them.

5        And I don't think either of the law offices, for what the

6   clients are going to be able to pay out of their pocket, can

7   afford the two law offices to do all of the research through

8   40,000 pages of paper looking for stuff that might be

9   relevant.  And if the two of them who worked on these papers

10  can't be in the same room without the lawyers, then they have

11  to pay three lawyers.  I mean, Mrs. Selgas has a lawyer, which

12  she should have her own lawyer because there is a legal

13  conflict, although they're happily married for about as many

14  years as I've been alive, I think, and there's not going to be

15  a problem with them in community.  The Court wisely said

16  they're husband and wife, they can talk to each other.  So

17  there's three people accused of this situation and two of them

18  can talk to each other and they can't talk to the third.

19       If there's a reason, I understand that, but we need to be

20  able to address the specific reason.  We have a Sixth

21  Amendment right to interview witnesses.  We have a Sixth

22  Amendment right to prepare for our trial, for cross-

23  examination.  The witnesses don't have to talk to us, but we

24  have the right to knock on the door and ask them if they will.

25  We don't even know all the -- we don't even know all

1   witnesses.

2        So if our client has talked to some of them in church

3   prohibitively, he's guessing who the witnesses will be,

4   because there's a CPA who worked on some of the paperwork.   So

5   we're making an intelligent guess that he's likely to be a

6   witness.   He's a witness we would like to call.   We are, when

7   the time comes for pretrial motions, going to ask to see if he

8   can be granted immunity so that we can get him to testify.

9   But it creates, I think, an unconstitutional burden in trial

10  preparation.

11       And I understand there's offsets.   Neither one of these

12  have any -- people have any criminal record.   Neither one of

13  them has ever been accused of any violence.   Neither one is

14  even suspected of trying to coerce a witness in any way.   If

15  that were to happen -- and it will not, there is no

16  possibility of that -- then we would agree to restrictions

17  without argument.

18       So there's no rational reason for this form.   And as I

19  said in our motion, the form actually, when you view it to its

20  full -- I apologize.   I used to teach English.   When you view

21  it literally, the agents can't talk to these witnesses.   So

22  when you view it literally, Mr. Mickelson and I wouldn't be

23  allowed to talk to the witnesses, either.   We are agents of

24  the clients, so we wouldn't be allowed to talk to them.

25       And there's one other issue that I -- I didn't -- I found

1   a case on it today.  My client -- this is important to my

2   client.  I did not file it previously because I didn't see any

3   law on it.  He showed me some law this morning, 30 minutes

4   ago, and I handwrote a motion, which I would like to speak on

5   in a minute.  I've served it on the Government.  They're not

6   prepared to respond, and I'm not asking the Court to rule

7   today, but I would like to speak on it, because it is an

8   important issue regarding the Second Amendment.  And I

9   apologize for my bad handwriting.  I haven't filed a

10  handwritten motion --

11          THE COURT:  Okay.  Well, let me stop you right there.

12          MR. MINNS:  Yes, ma'am.

13          THE COURT:  This motion goes to the conditions of

14  release?

15          MR. MINNS:  Yes.

16          THE COURT:  Okay.

17          MR. MINNS:  Yes.  Only -- I think that -- unless -- I

18  believe -- I'm not prepared to talk about anything except the

19  conditions of release today.  I apologize if there's --

20          THE COURT:  I am not, either.

21          MR. MINNS:  Okay.  Thank you, Your Honor.

22          THE COURT:  So, and I think the previous order you

23  filed that was referred to me, if it's related to conditions

24  of release, I can probably hear you on it.  But if it's

25  something else, --

1          MR. MINNS:  No, it's not.

2          THE COURT:  -- you said the Second Amendment, so I

3  wasn't sure.

4          MR. MINNS:  It's -- I'd be happy to explain.

5          THE COURT:  Let's do one thing at a time.

6          MR. MINNS:  Yes, ma'am.

7          THE COURT:  Okay.

8          MR. MINNS:  Certainly.

9          THE COURT:  The first thing I want to talk to, go

10  back to, is the -- Mr. Green visiting with the Selgases

11  without their counsel being present.

12          MR. MINNS:  Could I add one thing that's very

13  important?

14          THE COURT:  Yes.

15          MR. MINNS:  My client is staying in a hotel tonight.

16  He's using those funds that could be used for his family and

17  his wife.  And if we have a trial, he's going to be staying in

18  a hotel under this existing order.  Otherwise, he would stay

19  with the Selgases.  So this is another expense that he has to

20  incur that doesn't help the Government prosecute their case at

21  all and it doesn't cause any harm.

22      But they're -- and neither me or Mr. Mickelsen have been

23  offered the opportunity to stay in the Selgases' home for the

24  next few days.  And we would have to decline -- I would, and

25  I'm assuming Mr. Mickelsen would, too -- if it were extended.

1   We can't -- it's so unworkable.  I mean, they're deprived of

2   -- my client is from Idaho.  He has to pay to fly up here.  He

3   has to pay for lodging.  If this trial lasts two or three

4   weeks, it's going to be a very substantial expense, in

5   addition to all the other expenses.  Sometimes that happens.

6   But there's no reason for it because he can stay with the

7   Selgases.  If the order is changed.  Under the existing order,

8   he can't.

9           THE COURT:  Right.  Right.  So, I just want to

10  address that question and if this is really the least

11  restrictive condition of release that will assure the safety

12  of the community and the Defendants' appearance.  And

13  obviously, there are sort of generally questions about

14  obstruction of justice, but can you specifically address the

15  Defendants speaking to each other without counsel present?

16          MR. KEMINS:  Well, I suppose my only observation to

17  that, and I realize that they haven't been found guilty yet,

18  but -- I don't mean to sound like a smarty pants -- but maybe

19  that's one of the downsides of being -- participating in a

20  conspiracy, or at least the Government's contention of a

21  conspiracy, that you, during the pendency of the pretrial

22  hearings, you can't talk your co-conspirators without your

23  lawyers present.

24      And, I mean, in terms of the paperwork, we gave all three

25  counsel identical discovery.  So it's not like it's residing

1  in one place that, you know, all these 40,000 pages were

2  turned over to each counsel.  So, you know, despite the fact

3  that the Selgases are here in Texas and Mr. Green is in Idaho,

4  you know, they can work with their counsel on that.  Their

5  counsel can go through that.

6      I suppose, if they're finding that this is becoming a

7  financial hardship, they could come back to the Court and say,

8  we can't afford this anymore, file the proper financial forms,

9  and see if they qualify for appointed counsel.  But our view

10  is that for the three of them to be able to get in -- just be

11  in the same room unsupervised, we're just not in favor of

12  that.

13      So, again, we're trying to be as reasonable as possible.

14  We think we are, in terms of different methods that people

15  meet these days without being in the same room.  We wouldn't

16  oppose any of those.

17          THE COURT:  Such as--?

18          MR. KEMINS:  Conference calls, teleconferences,

19  Skype.  You know, whatever.  Some sort of group meeting app or

20  something like that.  You know.

21          THE COURT:  Would the Government require each of

22  their attorneys to be present, or could --

23          MR. KEMINS:  One could be there.

24          THE COURT:  -- one just supervise the --

25          MR. KEMINS:  One.  One could do it.  Yeah.  All three

```
 1    would not have to be there at the same time.  Obvi... I'm
 2    sorry.
 3              MR. MICKELSEN:  That's fine.  Could I be heard, just
 4    briefly?
 5              THE COURT:  Yes.  Yes.
 6              MR. MICKELSEN:  So I'll just try to be more focused.
 7    The practical concern -- I appreciate the Government agreeing
 8    that we should be able to meet basically for joint defense
 9    purposes.  But the practical concern is Mr. Green is a
10    practicing lawyer.  He's not precluded from practicing law
11    right now.  His office is on Mr. Selgas' property currently,
12    like most of his files.  What he would do is he, from what I
13    understand, --
14              THE COURT:  Here in --
15              MR. MICKELSEN:  In Texas.
16              THE COURT:  In Texas?
17              MR. MICKELSEN:  Yes.  Yes, he'd work -- he'd fly --
18    prior to the indictment, he was coming down about every few
19    weeks, would stay with the Selgases.  Mr. Selgas basically
20    worked as a legal assistant.  And so they're -- right now, his
21    files and his -- and those things are at Mr. Selgas' house.  I
22    don't think the Government has any evidence or any reason to
23    believe there's anything nefarious about the legal practice or
24    that relationship.
25       In addition, they are both partners in a business called
```

1   MyMail, which basically deals with patents and intellectual

2   property.  And so there's business that they undertake

3   together that I don't think has anything to do with the tax

4   issues and the issues involved in the indictment.

5       So I think those are the most practical concerns.  I don't

6   think -- I clearly understand the order to mean that we can

7   speak to witnesses.  Maybe clarifying language saying don't

8   speak about the case to potential witnesses.  I think that

9   would be a reasonable, you know, modification to that

10  condition of release.

11      But I just wanted to bring the Court's attention to what I

12  think the practical thing is, is I think there's a legitimate

13  law practice that Mr. Selgas has been assisting Mr. Green at

14  for years.  Many of those files and things are on Mr. Green's

15  -- on Mr. Selgas' property.

16           THE COURT:  Can you describe this property to me?

17  Are we talking about like a garage apartment behind a house?

18  I don't have a --

19           MR. MICKELSEN:  It's in a renovated barn that they've

20  made into like an office.  It's a -- actually, a barn

21  building, but there's an office out there with files and

22  computers.

23           THE COURT:  And have you visited the property since

24  -- I mean, has Mr. Green been able to -- I don't mean to

25  engage you directly, but has he visited the property and his

1  office since the indictment?

2          MR. MINNS:  Not since the release order because it

3  precludes him from meeting without all of the attorneys.  And

4  my office is in Houston.  It precludes him from meeting with

5  the Selgases.  So he can't go onto their property without the

6  possibility of violating the order.

7      So he is restricted right now from going into -- he works

8  some in Idaho, where he lives with his wife and family, and he

9  works some in -- out of Mr. Selgas' home, which is where all

10  of his files are.  And he has not been to that home since the

11  bond restriction.

12          THE COURT:  Did you know this reason?

13          MR. KEMINS:  I just found this out this morning, Your

14  Honor.

15      In terms of the MyMail, the only thing I'll say about

16  MyMail is that activities at MyMail are mentioned in the

17  indictment because some of the money that the Government

18  alleges the taxes were evaded on by the Selgases were derived

19  from the operations of MyMail.

20      Now, I know both Mr. Selgas and Mr. Green, from what I

21  remember, are fairly minority partners in MyMail.  There is

22  one man named Richard Derby who owns all of it.  I don't know

23  what Mr. Derby's position is.  I know he's fond of both Mr.

24  Selgas and Mr. Green in terms of can I run -- he could --

25  MyMail is somewhere further out in Texas.  And so I don't know

1    what regularity they are both out at MyMail, if they

2    teleconference with Mr. -- you know, we don't know that.  So I

3    haven't heard anything about the MyMail operations being

4    severely damaged, but this morning is the first I've heard

5    that Mr. Green had files out at Mr. Selgas' property and that

6    he actually worked out at Mr. Selgas' property and that

7    somehow there was an issue with MyMail.  I mean, you know, I

8    would think that with MyMail they could both do their work

9    separately for it and -- I don't know.  I just don't know

10   enough about it because I didn't learn about it until a half

11   hour ago, if that long.

12            THE COURT:  Well, it is news to me as well, this

13   piece about the office being on the Selgases' property.  Does

14   he rent the space from the Selgases for the office?

15            MR. MICKELSEN:  I don't think he pays any rent for

16   the space.

17            THE COURT:  Okay.  It's just made available for

18   issues?

19            MR. MICKELSEN:  It's just made available.  You know,

20   now, in total candor, so that -- so -- they had this -- this

21   part is part of the indictment, is Mr. Selgas was -- expenses

22   were paid through Mr. Green's IOLTA account, and so this all

23   served as -- that's a part -- I mean, they're longtime

24   friends.  They have this longtime relationship.  So all of

25   that, that was part of the relationship.

1        In other words, you can use my barn, you can keep files

2   out here, I'll do legal work for you.  And he was -- and Mr.

3   Green was using his IOLTA account and paying Mr. Selgas'

4   expenses.  And that's part of the indictment.  But that's

5   done.  That's stopped.  There will be no more of that.  Now

6   there's just a legitimate law practice and this relationship

7   that the two have.

8        So, and you know, I asked the prosecution if they had any

9   reason to believe that the law practice was engaged in any

10  criminal conduct, or MyMail, and the Government said no.  And

11  so, given that there's -- the nature of the allegation, it's a

12  tax case, and the fact that these men have a longstanding

13  business relationship, it just, to me, it seems reasonable to

14  permit them to continue to meet and work together.

15       The tax issue is -- everything related to the tax is

16  stopped.  In other words, Mr. Green is shutting down his IOLTA

17  account.  He wants to return the funds that he -- that belong

18  to Mr. Selgas back to Mr. Selgas.  They want to wind up their

19  law business, and they want to be able to communicate in

20  relation to MyMail.

21            THE COURT:  Well, I know, and I think they would be

22  able to wind up their relationship if they're not allowed to

23  talk to each other.  It does seem onerous to require the

24  attorneys to supervise that.

25            MR. KEMINS:  You know, again, at this point, you

1  know, in terms of their relationship, we knew what our

2  investigation revealed, which had to do with Mr. Green paying

3  their bills and things like that.  We didn't know until this

4  morning, as I told the Court, about what was going out where

5  they lived in I think it's Palestine, Texas, or whatever.  And

6  in terms of MyMail, --

7          THE COURT:  Sure.

8          MR. KEMINS:  -- you know, we hadn't had anybody from

9  MyMail come to us and say, jeez, guys, we're really hurting

10 with these things.  So, --

11         THE COURT:  Now that this additional information has

12 come up, do you think we could craft by agreement some

13 modification to the conditions of release?

14         MR. KEMINS:  Sure.  Yeah.  I don't see why we can't

15 come to some agreement on that, that, you know, obviously, Mr.

16 Mickelsen and Mr. Minns know and they can instruct their

17 clients, and I'm sure the Court will, that trying to get smart

18 and do some sort of end run will just get them in more

19 trouble.  So, --

20         THE COURT:  Absolutely.

21         MR. KEMINS:  -- you know, I -- again, I don't want to

22 deprive them of their ability to defend themselves, either in

23 meeting with their counsel or in paying their counsel.  So if

24 we can craft something along those lines, we're good with it.

25         THE COURT:  Right.  I certainly don't want the

1  conditions of release to have these unintended consequences

2  that hamper the prosecution, the defense, or anything with

3  respect to these parties' other aspects that is not really

4  related to showing up and keeping the community safe.

5       MR. KEMINS:  Yeah.  And in light of one other thing

6  that Mr. Minns said, obviously, we're not Probation, but if

7  Mr. Green or the Selgases meet with someone who turns out to

8  be a witness but they honestly don't know they're a witness

9  because nobody has published any witness lists yet, we're not

10  going to be banging on your door saying violate them, so --

11       MR. MINNS:  If I could respond to that.  Because Mr.

12  Kemins is an honorable man.  I don't have any doubt in my mind

13  that he wouldn't try to take unjust advantage of this.  It's

14  just that I think one of the reasons he trusts me on that,

15  we've been opposite each other and we've both always told each

16  other the truth back and forth.  So I'm ultra-cautious about

17  that.  I don't want to --

18       THE COURT:  Which is legitimate and I appreciate

19  everyone's concern for making sure that they stay within the

20  strictures of the conditions.  But I don't think it is

21  intended at all to prevent the Defendants from having a casual

22  conversation with their friends at church.  We could, I think,

23  craft a modification that will prohibit them from discussing

24  the case with other people who might be potential witnesses.

25  But otherwise, they should be able to have normal interactions

1   in their community.

2           MR. MINNS:  Well, it goes further than that, though,

3   Your Honor.  There's a CPA that we want to interview in Idaho.

4   I --

5           THE COURT:  They want Mr. Green to do that?

6           MR. MINNS:  I would like him to be able to when we

7   start learning and I start -- I'm not -- I don't know this

8   case well enough to -- I've had to confer with my client on

9   several of the Court's questions.  So I don't yet know this

10  case well enough to answer all of these questions.  It's a new

11  case.  And basically, both law offices had other trials they

12  had to attend to, and since we couldn't really start working

13  together until we had this hearing, I'm not super-familiar

14  with it.  But I'm -- I know there's a CPA in Dakota.  In Iowa,

15  excuse me.  Who, I was in Iowa.

16          A VOICE:  Idaho.

17          MR. MINNS:  Idaho.  Excuse me.

18          THE COURT:  It's okay.  I've got the map of the

19  United States in my head and we're kind of moving all around.

20          MR. MINNS:  I know.  I apologize.

21          THE COURT:  I was in Idaho and then all of a sudden

22  we took this sort of turn to Iowa.  I was like, wait a minute.

23          MR. MINNS:  Never follow me for directions, Your

24  Honor.  I have a very bad sense of directions, and I'm going

25  to Houston and Bay City, Michigan for hearings right after

1   this.  I apologize.  And I even do that in trial.

2              THE COURT:  So, would you be available to, like if

3   there was a -- I think sort of the Defendant unsupervised with

4   a potential witness is a concern that I can understand.  But

5   if we were able to use technology to allow you to Skype into

6   that or to do it remotely so that it wasn't just the Defendant

7   with a potential witness, is that something that the

8   Government -- we think we could craft?

9              MR. MINNS:  I mean, --

10             MR. KEMINS:  Yeah, that'd be fine, too.  Even a

11  conference call.

12             MR. MINNS:  Can a --

13             MR. KEMINS:  Even a speakerphone.

14             MR. MINNS:  Can a paralegal be on it, so we don't

15  have to have an attorney from either one of the offices --

16             THE COURT:  On these --

17             MR. MINNS:  -- on the phone call?

18             MR. KEMINS:  That's fine.  We would not object to

19  that.

20             THE COURT:  Okay.

21             MR. KEMINS:  Just someone from the lawyers.  Just

22  whoever the lawyer sees fit to put on.

23             MR. MINNS:  And is the Court then saying that these

24  -- these two gentlemen have prepared cases which went in front

25  of courts and tried them.  Are they going to be prohibited

1  from interviewing witnesses unless there's an attorney in the

2  room with them?

3        THE COURT:  No.  No, not an attorney in the room with

4  them, but I think we have to have a legal -- someone from the

5  law firm at least on the phone, if it's, say, a conference

6  call.

7        MR. MINNS:  And it can be a paralegal?

8        THE COURT:  Can be a paralegal.  Just so that there's

9  a --

10        MR. MINNS:  A third party?

11        THE COURT:  A third party.  It's not really a third

12  party because they're --

13        MR. MINNS:  Yeah.

14        THE COURT:  Would be working for one of the

15  attorneys.  But at least a third person with an obligation to

16  the Court.

17        MR. MICKELSEN:  I would just state for the record,

18  because I want a witness to any conversations like that where

19  my client is talking to any potential witnesses, okay, so I

20  don't want a witness getting on the stand saying, well, Mr.

21  Selgas said this and Mr. Selgas said that but I didn't have a

22  witness there.  So I'm fine with that.

23        MR. MINNS:  And on the issue, the -- there's a --

24  it's a very complex case, but the issue relating to my client

25  is rather simple.  The Government is saying he used his IOLTA

1   account improperly.  And so we want permission of the Court,

2   because he's accused that he shouldn't write checks out to who

3   he wrote checks out to, we very much disagree, but we don't

4   want to get charged with something while this case is going

5   on, so we want the Court's permission, and the Government has

6   agreed to this, to --

7           THE COURT:  Yes.

8           MR. MINNS:  -- close -- and not the IOLTA account.  I

9   don't want to put my client out of business.  So he doesn't

10  want to close his IOLTA account.  He just wants to close the

11  Selgases' portion of his IOLTA account and send them a check

12  closing that out.

13          THE COURT:  Yes.  So the Court is going to grant the

14  motion.  The Defendants will be able to meet together in the

15  presence of counsel.  That can be accommodated with the use of

16  technology so that there's some sort of distance.

17      With respect to the IOLTA account, that one-time transfer,

18  that will be approved.

19      With respect to witnesses or other third parties, the

20  Defendants are only prohibited from talking about the case.

21  And then if they meet together or if they interview potential

22  witnesses, that can be accomplished remotely and there will be

23  a representative of the law firm representing the Defendant

24  present on that.

25      So what I'd like to do, and I'm seeing agreement with that

1   ruling, and so what I would like to do is have the parties

2   reduce this to writing in terms that they think are clear that

3   the Defendants can understand and submit that to me for a

4   signature.  Is that agreeable?

5           MR. MINNS:  The only clarification, Your Honor, --

6           THE COURT:  Yes.

7           MR. MINNS:  -- is what about the issue with the

8   ongoing business in relation to MyMail and the law firm?

9           THE COURT:  So, I think he should be able to go onto

10  the property to access the records with -- if they're -- I

11  don't really have my head around this MyMail business

12  situation and what it is that -- I certainly don't intend to

13  prohibit them from carrying on legitimate business.  But I

14  don't understand -- I don't have an understanding for how many

15  people are involved or what their -- what it is.  So, --

16          MR. MICKELSEN:  Well, could I suggest perhaps --

17          THE COURT:  Yes.

18          MR. MICKELSEN:  -- the order just say that they --

19  the Defendants may meet in relation to necessary business

20  activities pertaining to MyMail and the law practice?

21          THE COURT:  That doesn't touch on the case or any of

22  the allegations in the indictment.  I --

23          MR. MICKELSEN:  I mean, yeah, just that they may meet

24  and -- necessary and engage in that business, in the business.

25  Yes.  That it has nothing to do with the activities in the

1   indictment.

2           THE COURT:  And I --

3           MR. MICKELSEN:  Just to engage in the law practice

4   and --

5           THE COURT:  I think I heard the Government say

6   there's not really an objection but also that this piece with

7   the MyMail was new.  And so I would like just for everyone to

8   have a slightly better understanding.  But I think, with a

9   little bit of discussion between the attorneys, that that may

10  be able to be hammered out and we can have a modification that

11  --

12          MR. MICKELSON:  Okay.

13          THE COURT:  -- everyone is comfortable with.

14     But at this point, especially since I don't feel like the

15  Government has been completely informed as to what the -- all

16  the nuances of the situation, and I'm not completely clear on

17  it, that I would like you guys to see if, with a little

18  discussion, you can't agree to something that is workable for

19  the parties.

20     Because, as a concept, I'm not, but I feel like there's --

21  this is new.  The MyMail thing is a new piece to me.  I don't

22  understand it completely.  And I want to make sure the

23  Government understands it completely, because I think there

24  may actually be agreement with just a little bit more

25  information shared --

1         MR. MINNS:  The -- the --

2         THE COURT:  -- about what the Defendants want.

3         MR. MINNS:  Yeah.  They've worked together in my

4 client's law practice for ten years.  It's -- Mr. Selgas is

5 kind of like his right hand.  He doesn't know where to find

6 the files.  The -- there's -- I mean, he -- he doesn't -- I

7 mean, he asked to address the Court and I decided not -- to

8 ask him not to, because I -- but I want to make sure the issue

9 is -- is -- because he can't conceive of even handling his --

10 first of all, being indicted has crushed a great deal of his

11 practice anyway.  And he gives full disclosure to anybody that

12 wants to call him or talk to him, which is a good and

13 honorable thing to do but it further crushes the practice.

14     He thinks he would have trouble practicing without the

15 assistance of Mr. Selgas anyway.  I can see a situation where

16 these two long-term friends accidentally talk about something,

17 and they would be instructed to immediately get a paralegal or

18 a lawyer or somebody from one of the two firms on the phone or

19 Skype and stop it immediately, and they'd both be instructed

20 by counsel, if that happens, you have to stop.

21     But the issue of the IOLTA account is so finite.  After

22 you sign this order, the money will not exist.  There's no

23 possibility that my client will ever write a check from his

24 IOLTA account on behalf of Mr. Selgas again.  Therefore, that

25 issue is kind of dead.  Whether he had the right to or not I

1    guess is subject to, you know, the jury's findings ultimately.

2    But it won't matter, and he's not -- there's no possibility --

3    I would withdraw if they -- I can't even imagine resi --

4    conspiring to --

5            THE COURT:  Sure.  And I --

6            MR. MINNS:  -- nor move money through his IOLTA

7    account.

8            THE COURT:  So I think before the motion was even

9    presented to the Court, there was a lot of agreement that the

10   --

11           MR. MINNS:  Yes, Your Honor.

12           THE COURT:  -- the form was not satisfactory with

13   respect to the nuances of this situation, and I think counsel

14   came to a lot of agreement, and the Court will actually grant

15   to the extent it is agreed.

16       I think today there has been additional agreement as to

17   how some of these conditions can be modified.  And so what I

18   want to do right now is, with that preliminary ruling in mind,

19   allow the lawyers to go back and to send me a proposed order

20   that will allow these modifications.

21       Now, I have not seen your handwritten motion.

22           MR. MINNS:  I'm sorry, Your Honor.

23           THE COURT:  So it may not be appropriate for me to

24   consider it now.  But you said Second Amendment, so are there

25   guns in Idaho that someone wants access to?  Is that what

1  you're talking about?

2          MR. MINNS:  Yes, Your Honor.  And in all fairness to

3  Mr. Kemins, I wrote in the motion that we would not ask for a

4  ruling today.

5          THE COURT:  Okay.

6          MR. MINNS:  He has not had time to brief this --

7          THE COURT:  Okay.

8          MR. MINNS:  -- or respond.  And I apologize to Mr.

9  Kemins and apologize to the Court, my -- not just because my

10  handwriting is horrible but because I don't like to do it on

11  the spur the moment, but -- and I'm not a hunter, Judge, so I

12  don't understand -- and I apologize also to my client in that

13  regard.  Where he lives is in a -- in the winter is a

14  dangerous place.

15          THE COURT:  I'm familiar with the state of Idaho.

16          MR. MINNS:  Ah.  So, --

17          THE COURT:  So are you worried about bears?

18          MR. MINNS:  Yes, Your Honor, and other -- well,

19  you're more -- I'm familiar -- I've been there -- I've spent

20  one day in the state of Idaho.  And it was not in the winter.

21  So, so he has a large family.  They have eliminated all guns

22  from the household.  This is not a case that has anything to

23  do about violence or guns.  And we found a -- I refused to

24  file a motion until I found a case on point allowing the

25  weapons, and that's why I apologize to everybody, I felt I

1   committed malpractice not filing it.

2           THE COURT:  So, I'm -- what I'm going to let you do

3   is allow the Government to review it.  This also needs to go

4   to whoever the supervising officer is, because I will want

5   them to weigh in on this issue as well.

6           MR. MINNS:  Of course, Your Honor.

7           THE COURT:  Or your Pretrial supervising officer.

8           MR. KEMINS:  Again, if like -- I'd briefed it, you

9   know, if there's a -- there might be a way to reach a

10  compromise.  If we're worried about bears, you know,

11  certainly, one rifle, one bolt-action -- I hate to --

12          THE COURT:  No, no, I --

13          MR. KEMINS:  -- try to get into who needs what guns

14  these days, but --

15          THE COURT:  I know where you're -- exactly.  Yes.

16          MR. KEMINS:  But --

17          THE COURT:  If we're talking about something for a

18  bear.  But like I said, I do want the supervising -- the

19  Pretrial supervising officer to visit with you about that,

20  because their recommendation will be very important to me.

21  And they're the ones who are going out to the house visiting.

22          MR. MINNS:  My client informs me that he -- and this

23  will be done for a second time, but he had already visited

24  with the officer on this issue and the officer told him that

25  they -- that this is not their objection and they don't have

 1   an objection to it.  My client was a --

 2              THE COURT:  Okay.

 3              MR. MINNS:  Was a police officer for ten years.

 4              THE COURT:  Well, police officers --

 5              MR. MINNS:  Yes.

 6              THE COURT:  -- (overspoken).  At this moment in time,

 7   we're talking about protection from bears --

 8              MR. MINNS:  That's correct, Your Honor.

 9              THE COURT:  -- as they're working towards their den

10   and trying to get one more, you know, trash can full of

11   yumyums before they go and hibernate for the winter.

12       So it's not really ripe for the Court's consideration at

13   this moment, so I'm going to let it ripen.  And like I said, I

14   want the Government to be able to weigh in.  I want the

15   supervising -- the motion -- if you need to file a supplement

16   that indicates that you've talked to the Pretrial Services

17   officer about it and have their recommendation in there as

18   well, I think this may also be something that can be worked

19   out.

20              MR. KEMINS:  And I guess I don't know what weapons

21   Mr. Green had in his house, but if he has a preferred bear

22   protection rifle, maybe they can inform us of that and we

23   could just make --

24              THE COURT:  Perhaps, as long as it's not, you know,

25   something that would also -- there are --

1        MR. KEMINS:  Well, yeah, I don't know if --

2        THE COURT:  I don't want to get into that.

3        MR. KEMINS:  I don't know if he needs an M16 machine

4   gun for a bear, but, you know, --

5        THE COURT:  I'm sure it would do the trick, but

6   there's probably something else that would work.

7        MR. KEMINS:  I suppose in terms of also MyMail, I

8   think to give the defense lawyers -- let me ask my agent if --

9   to give Mr. Derby a call, who I understand still runs the

10  whole -- it's his show, and talk to him, and then that might

11  help us work out some compromise.  But --

12       THE COURT:  I think so.

13       MR. KEMINS:  -- if they could let -- one of them

14  could let Mr. Derby know that the agent may call him and he

15  doesn't immediately have to call his lawyer.

16       THE COURT:  Sure.  Do you think we might be able to

17  have a proposed order by Monday?  Do you think that is doable?

18       MR. KEMINS:  I --

19       THE COURT:  I know you're headed to Michigan.

20       MR. MINNS:  Yes, Your Honor.

21       MR. KEMINS:  I'm headed to Tennessee, but if Mr. --

22  if somebody wants to take that -- a shot at drafting it, I'm

23  not opposed to taking a look at it.

24       MR. MICKELSEN:  I'm just not sure I got everything.

25  You're out of town until Monday?

1          MR. MINNS: I've got two hearings coming up, and one

2     of them is in Bay City, Michigan and there's no direct

3     flights.

4          THE COURT:  You're more than welcome to sit in the

5     hallway or even in my reception area for just a little bit to

6     put some of this together, handwritten on your notepad, and

7     then maybe it can be memorialized a little bit.  Essentially

8     --

9          MR. MICKELSEN:  We'll get it done.  I'll get it done.

10         THE COURT:  Okay.  And I'm just -- I feel like if

11    there's a deadline out there, there's, you know, a trigger for

12    me to check up on it and accountability for everyone.  I don't

13    want it to sort of get lost.

14         MR. MINNS:  I agree.

15         THE COURT:  So if Monday is pinching -- I don't want

16    it to be a pressure.  I was just trying to be helpful.

17         MR. MINNS:  No.  Usually, we're begging the judge for

18    exactly the order that you just gave us, and so --

19         THE COURT:  I put it on you guys to craft the orders

20    because that's -- we have a couple different things that are

21    working and you guys are going to be better able to put it in

22    terms that are acceptable to the Government and understandable

23    to the three defendants.

24         MR. MINNS:  And he is in town right now, and can he

25    give up his hotel reservation and stay at the Selgases' house?

1 | No?  Okay.  All right.

2 |       THE COURT:  No.  Let's get this all --

3 |       MR. MINNS:  Yes, Your Honor.

4 |       THE COURT:  -- squared away --

5 |       MR. MINNS:  I got it.

6 |       THE COURT:  -- and memorialized.

7 |       MR. MINNS:  I'm just talking.

8 |       THE COURT:  Good try.  All right.  Then we're

9 | adjourned as to this matter.  Thank you.

10 |       MR. MINNS:  Thank you, Your Honor.

11 |       MR. MICKELSEN:  Thank you, Your Honor.

12 |       MR. KEMINS:  Thank you, Your Honor.

13 |     (Proceedings concluded at 10:18 a.m.)

14 |                --oOo--

15 |

16 |

17 |

18 |

19 |                CERTIFICATE

20 |     I certify that the foregoing is a correct transcript from

21 | the sound recording of the proceedings in the above-entitled matter.

22 | **/s/ Kathy Rehling**           **12/08/2018**

23 | _____   _____

24 | Kathy Rehling, CETD-444         Date
Certified Electronic Court Transcriber

25 |

35

INDEX

PROCEEDINGS                                              3

WITNESSES

-none-

EXHIBITS

-none-

RULINGS                                                 24

END OF PROCEEDINGS                                      34

INDEX                                                   35