UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

UNITED STATES OF AMERICA

v.                                                    CRIMINAL NO. 3-18-CR-356-S

THOMAS D. SELGAS (1)
MICHELLE L. SELGAS (2)
JOHN O. GREEN (3)

UNITED STATES' TRIAL BRIEF

NOW COMES the United States of America and respectfully submits this Trial Brief to

aid the Court in presiding over the upcoming trial of *United States v. Thomas D. Selgas et al.*

## I. PROCEDURAL BACKGROUND

The trial of *United States v. Thomas D. Selgas et al.* is scheduled to begin on this Court's

September 23, 2019 docket. Thomas Selgas, Michelle Selgas and John Green are charged with

one count of conspiring to defraud the United States, in violation of 18 U.S.C. § 371 (*Klein*).

Thomas Selgas and Michelle Selgas are also each charged with tax evasion, in violation of 26

U.S.C. § 7201.

## II. STATEMENT OF ANTICIPATED FACTS

The evidence at trial will show that Thomas Selgas, Michelle Selgas and John Green

engaged in a scheme to defraud the United States by impairing and impeding the lawful function

of the Internal Revenue Service ("IRS") from December 2005 up to August 2017. During the

timeframe of the conspiracy, Thomas and Michelle Selgas owed a tax debt to the IRS. Instead of

paying the taxes that they owed, the Selgases, with Green's help, hid their money and assets

from the IRS.

2005 Tax Debt

In and around 2003, Thomas Selgas co-founded MyMail, Ltd. ("MyMail"), an intellectual property development and licensing partnership. In 2005, there were 17 partners of MyMail, including Thomas Selgas and his wife, Michelle Selgas.[1] Thomas Selgas had a 2% partnership interest and Michelle Selgas had a 26% partnership interest in MyMail.

During the tax year 2005, MyMail settled various lawsuits against internet service providers for approximately $11 million ($6.8 million after attorneys' fees). MyMail's accountant originally prepared the tax return for MyMail, an IRS Form 1065 (U.S. Return of Partnership Income), and sent the corresponding Schedule K-1s (Partner's Share of Income, Deductions, Credits, etc.) to each partner reporting their share of MyMail's income. The original K-1s reported business income to Michelle Selgas in the amount of $1,559,411 and business income to Thomas Selgas in the amount of $117,187. Furthermore, in 2005, Michelle Selgas received approximately $1 million and Thomas Selgas received $82,000 in distributions and withdrawals from MyMail. Despite earning this money and receiving large distributions, the Selgases did not file a valid, personal income tax return for 2005 nor did they pay the tax due on their over $1.5 million in earned income.

The tax debt for tax year 2005 for Michelle and Thomas Selgas, as of July 25, 2019, is approximately $979,000.

1998 to 2002 Tax Debt

When the Selgases received the $1.1 million in 2005, they already owed outstanding tax debt for the years 1998 through 2002. For 1998 through 2002, the Selgases did not file valid tax returns so the IRS conducted an examination and assessed taxes against the Selgases pursuant to

---

[1]Eight of those partners were family trusts related to one individual partner.

substitute for return procedures, 26 U.S.C § 6020(b). The Selgases tax liabilities for these years stem mainly from Thomas Selgas' work at another company that he co-founded, Chipdata.

In response to collection action by the IRS to collect this tax debt, the Selgases, with the help of John Green, contested the collection efforts in Tax Court. In September 2005, after a hearing and briefing, the Tax Court ruled against Michelle Selgas and ordered that the IRS may proceed with the collection action as determined in the notice of determination concerning collection action for 1997-2001.[2] Michelle Selgas appealed the decision to the Fifth Circuit, which affirmed without opinion, the Tax Court's decision. *Selgas v. Commissioner*, 209 Fed. Appx. 383 (5th Cir. Dec. 11, 2006), *cert. denied* 551 U.S. 1103 (2007).

Thomas Selgas filed a separate petition in Tax Court for his 2002 tax debt. In November 2005, after a hearing and briefing, the Tax Court ruled that Thomas Selgas also owed taxes for tax year 2002. Thomas Selgas appealed the Tax Court decision to the Fifth Circuit, which affirmed in a written opinion in January 2007. Indeed, the Fifth Circuit found that:

> Selgas's arguments are utterly lacking in merit and, as an aside his conduct in this litigation appears to have been inconsistent with that of a litigant endeavoring to aid in the truthful and efficient resolution of contested issues of facts and law. We have no sympathy for Selgas's behavior or his arguments in defense of what appears to have been a brazen attempt to avoid a few thousand dollars in legitimate tax liability.

*Selgas v. Commissioner*, 475 F.3d 697, 701 (5th Cir. 2007), *cert. denied* 552 U.S. 824 (2007).

For their 1998 through 2002 tax debt, the Selgases owe approximately $130,000.

<u>The Scheme to Impair and Impede the IRS</u>

When the Selgases received their windfall from the MyMail settlement, they did not pay the taxes that they owed on the $1.5 million nor did they pay their back taxes from 1998-2002.

---

[2] The Tax Court petition filed separately by Thomas Selgas for 1997-2001 was dismissed for lack of jurisdiction in November 2005.

Instead, the Selgases transferred their $1 million to a precious metal dealer, Dillon Gage, and purchased over 7,000 American Eagle gold coins to hide the money from the government.[3]

Not only did the Selgases fail to pay their owed taxes, the Selgases did not truthfully and accurately report their income to the IRS. While MyMail originally filed tax returns that reported the net settlement proceeds, Thomas Selgas and John Green caused MyMail to file a second tax return for 2005 that significantly underreported the settlement proceeds. On this second Form 1065, Selgas and Green caused MyMail to espouse a "lawful money" theory that devalued the settlement proceeds, for IRS reporting purposes, to correspond to the face value of gold coins, not the fair market value of the coins.[4] Selgas and Green then caused false K-1s to be issued to the MyMail partners.[5]

Despite receiving the original K-1s that reflected income over $1.5 million, the Selgases did not file a valid, personal income tax return for 2005. Again with Green's help, the Selgases

---

[3] Notably, precious metal dealers are not required to report a customer's sale of American Eagle gold coins to the IRS (unlike other coins that do carry reporting requirements).

[4] For instance, if the Defendants earned $1,000 and used that $1,000 to purchased two .25oz $10 American Eagle gold coins (each coin with a fair market of $500). The Defendants would argue that their income was only $20 (two $10 American Eagle gold coins) not the $1,000 that they earned. Unsurprisingly, courts have repeatedly found this to be a meritless theory. *See Mathes v. Commissioner*, 576 F.2d 70, 71 (5th Cir. 1978)("[t]axpayer's attempt to devalue the Federal Reserve notes they received as income is, therefore, not lawful under the laws of the United States.")

[5] In response to an IRS audit, MyMail filed a complaint in the District Court of the Eastern District of Texas arguing, among other things, that MyMail was entitled to a "currency fee" deduction on the "basis that American Eagle gold and Liberty silver coins are lawful money." After motions for summary judgment, in September 2011, the District Court ordered that MyMail was not entitled to a currency fee deduction for 2005. MyMail then appealed to the Fifth Circuit. Although MyMail had waived its right to appeal on the merit of the currency fee deduction issue, in January 2013, the Fifth Circuit stated that "courts have long held that such arguments are frivolous." (GX 66).

submitted to the IRS a "Statement in Lieu of a 1040" that reflected the income reported on the false K-1. On this "Statement in Lieu of a 1040" the Selgases and Green significantly devalued the Selgases' income from over $1,500,000 to $176,640.

To spend their significant earnings now in gold coins, the Selgases would redeem the coins, i.e. sell the coins back to Dillon Gage. Dillon Gage would write a check to Thomas Selgas for the purchase of the coins at the fair market value, and Selgas would deposit the redemption check into Green's IOLTA. Green would, then, pay the Selgases' credit card bills through his IOLTA. Throughout the years, as the Selgases received additional funds, whether through MyMail, gold coin redemption or elsewhere, they continued to deposit their money into Green's IOLTA and continued to fail to file valid, tax returns. By conducting their affairs in this manner, the Selgases were able to keep money out of bank accounts in their names and impair and impede the IRS in the assessment, ascertainment and collection of taxes.

Additionally, the Selgases, with Green's help, purchased and sold real estate using gold coins in attempts to evade IRS collection and assessment, transferred their personal residence out of their name and into a trust, and Thomas Selgas caused distributions from his IRA in gold coins, attempted to cause the filing of false IRS Forms 1099, and did not report truthfully the distribution to the IRS.

## III. OFFENSE CHARGED

A.  <u>Conspiracy to Defraud the Government</u>

The Indictment charges Thomas Selgas, Michelle Selgas and John Green with conspiracy to defraud the United States. Title 18, United States Code, Section 371 provides, in relevant part:

> If two or more persons conspire to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be guilty of an offense against the United States.

To establish a violation pursuant to § 371, the government must prove: (1) that two or more persons agreed to defraud the United States; (2) that at some point during the existence of the conspiracy or agreement, one of the members of the conspiracy knowingly performed one of the overt acts charged in the indictment in order to accomplish the object or purpose of the agreement; and (3) that the defendant had the intent to defraud the United States. *See United States v. Yamin*, 868 F.2d 130, 133 (5th Cir. 1989). It is noted that a tax due and owing is not an element of a § 371 charge.

1. Agreement

Proof of a written document or express agreement evidencing the conspiracy is rarely possible and is not required. *See United States v. Aubin*, 87 F.3d 141, 145 (5th Cir. 1996)(internal citations omitted)("it is not necessary that the evidence show an express or formal agreement; evidence of a tacit understanding is sufficient"); *see also United States v. Martin,* 790 F.2d 1215, 1219 (5th Cir.1986)("no express agreement to violate the law need to be shown and the conspiracy may be proven by showing that the defendant conspired with one or more others…to achieve an illegal purpose.")."The existence of a conspiracy may be proved by circumstantial evidence and may be inferred from concert of action." *United States v. Yamin*, 868 F.2d at 133. "Since conspiracy is a crime which by its nature tends to be secret, the agreement is seldom susceptible to direct proof." *United States v. Perez*, 489 F.2d 51, 61 (5th Cir. 1973).

Here, the existence of a conspiracy is shown through the Defendants' concert of action. Thomas Selgas and Michelle Selgas received a large settlement from their interest in MyMail. With John Green's help, they caused MyMail to file a false tax return and then attempted to hide their share of the settlement through gold coins and Green's IOLTA. During this time, the

Selgases and Green knew that the Selgases owed taxes, but refused to pay or truthfully deal with the IRS and continued to conduct their affairs in ways to impair and impede the IRS.

### 2.   Overt Act

The term "overt act" simply means some type of outward objective action performed by one of the members of the conspiracy which evidences that conspiracy. And, in this regard, the government is not required to prove beyond a reasonable doubt all of the overt acts alleged in the indictment; proof that at least one overt act was committed in furtherance of the conspiracy is sufficient. Furthermore, the government may prove at trial overt acts that are not charged in the indictment. *See United States v. Johnson*, 575 F.2d 1347, 1357 (5th Cir. 1978)

"It is settled law that overt acts charged in an indictment for conspiracy need not be criminal; rather, they may be non-criminal acts which further the conspiracy." *United States v. Willis*, 585 F.2d 203, 207 (5th Cir. 1978); *see Iannelli v. United States*, 420 U.S. 770, 786 (1975)(an overt act can be innocent in nature, provided it furthers the purpose of the conspiracy).

Here, among other acts, Thomas Selgas, Michelle Selgas and John Green (1) caused MyMail to file a false 2005 tax return and caused the issuance of false K-1s to the MyMail partners; (2) caused the transfer of $1 million to purchase gold coins; (3) redeemed the gold coins and deposited the proceeds into Green's IOLTA; (4) deposited other monies belonging to the Selgases into Green's IOLTA; and (5) paid the Selgases credit card bills from the IOLTA. Proof of any of these acts—or any of the many other acts taken by the Defendants in furtherance of the conspiracy—will suffice to satisfy the overt-act requirement.

### 3.   Intent

The intent required to prove the conspiracy is the intent to impede, impair or obstruct the ability of the IRS to ascertain, compute, assess or collect the Selgases' true tax liability. As noted

above, proof of the requisite intent may be established entirely by circumstantial evidence. *See United States v. Schmick*, 904 F.2d 936, 941 (5th Cir. 1990). While the prosecution must show knowledge of and intent to join the conspiracy beyond a reasonable doubt, *United States v. Bland,* 653 F.2d 989, 996 (5th Cir.), *cert. denied,* 454 U.S. 1055 (1981), it need not show that each defendant knew all the details of the conspiracy. *United States v. Parrish,* 736 F.2d 152, 157 (5th Cir.1984).

Here, the evidence will show that the Selgases and Green knew from the IRS, the courts and even the local county appraisal office that their "gold standard" theory was repeatedly rejected. Despite this, the Selgases and Green continued to send the IRS documents that understated their income, continued to assert positions contrary to court decisions, and handled their affairs in a ways to impair and impede the IRS in the ascertainment, assessment and collection of taxes, including using Green's IOLTA to hide the Selgases' money.

B.  Tax Evasion for 1998 through 2002 and 2005

The indictment charges Thomas Selgas and Michelle Selgas each with one count of tax evasion, in violation of 26 U.S.C § 7201. The crime of tax evasion has three essential elements: (1) existence of a tax deficiency; (2) willfulness; and (3) an affirmative act constituting evasion or attempted evasion of the tax. *United States v. Bishop*, 264 F.3d 535, 545 (5th Cir. 2001).

1.  Existence of a tax deficiency

While the government must demonstrate the existence of a tax deficiency beyond a reasonable doubt, it need not prove the deficiency with mathematical certainty. *Id.* Thomas Selgas was charged with evasion of payment of taxes for years 1998 through 2002 and 2005, and Michelle Selgas was charged with evasion of payment for taxes for years 1998 through 2001 and 2005. As explained above, there exists a substantial tax deficiency. Certified IRS Records, Tax

Court decisions and Fifth Circuit opinions and judgments will prove the existence of a tax deficiency.

> 2.   Affirmative Act

An affirmative act includes "any conduct, the likely effect of which would be to mislead or to conceal." *See Spies v. United States*, 317 U.S. 492, 499 (1943). The government must prove an affirmative act and cannot rely solely upon a failure to act or failure to file a tax return. *Id.*; *United States v. Masat*, 896 F.2d 88, 97–99 (5th Cir. 1990). Here, as stated above, there were many affirmative acts taken by Thomas Selgas and Michelle Selgas in an effort to mislead the IRS and to conceal their money and other assets from possible collection.

> 3.   Willfulness

The Supreme Court has defined willfulness as the "voluntary, intentional violation of a known legal duty." *United States v. Pomponio*, 429 U.S. 10 (1976); *United States v Garcia*, 762 F.2d 1222, 1224 (5th Cir. 1985). That is to say, a defendant is willful if he knew what his duty was under the law, and he acted or failed to act with the specific intent to violate the law. If, however, a defendant has a good faith misunderstanding or mistaken view of the law, he is not willful. *See Cheek v. United States,* 498 U.S. 192 (1991).

Willfulness is rarely subject to direct proof and generally must be inferred from the circumstantial evidence. The government may prove knowledge of the duty to file accurate returns and pay taxes through facts and circumstances, such as defendant's tax history, notice and correspondence from the IRS, courts and others. *See, e.g.*, *United States v. Barnett*, 945 F.2d 1296, 1299 (5th Cir. 1991)(permitting jury to consider pattern of non-filing). Moreover, a defendant's attitude toward the IRS is probative of willfulness. Indeed, evidence of a defendant's personal philosophy and activity as a tax protester is relevant and material to the question of

intent. *See United States v. Reed,* 670 F.2d 622, 623 (5th Cir. 1982) ("Evidence of a person's philosophy, motivation and activities as a tax protester is relevant and material to the issue of intent."); *see also United States v. Brown,* 591 F.2d 307 (5th Cir. 1979) (defendant's "status as a tax protester and the statements he made regarding the payment of taxes buttressed the circumstantial evidence on the willfulness of his actions").

The government anticipates that the Defendants will argue that they had a good faith subjective belief that they did not owe additional taxes based on their "lawful money" theory. This theory, and the other theories asserted by the Defendants over the years, as a matter of law are incorrect and a defendant has no right to argue that these mistaken theories are correct statements of the law. The Defendants may, however, argue that they in good faith believed in this incorrect theory. The jury must determine whether the Defendants in fact had a good faith belief or whether the Defendants were merely trying to create an excuse to avoid their legal duty to pay taxes.

The evidence will show the Defendants did not possess a good faith subjective belief based upon a misunderstanding of the tax law. Rather the Defendants repeatedly defied the tax laws despite being told by the IRS and other authorities that their position was frivolous. The Defendants' adoption of the "lawful money" theory was simply the latest chapter in their ongoing efforts to cheat the United States.

## IV. POTENTIAL EVIDENTIARY ISSUES

Below is a brief summary of the types of evidence upon which the government intends to rely and the possible legal issues that may arise in offering such testimony. In each instance, the government submits that the evidence it intends to offer is admissible under the Federal Rules of Evidence.

A.  Statements by a Party Opponent

During its case-in-chief, the United States will present statements by Thomas Selgas, Michelle Selgas and John Green. Such statements are admissions and as such they are substantive evidence and not hearsay. Such statements are admissible under Rules 801(A) and 801(d)(2)(A) of the Federal Rules of Evidence. Here, the Defendants sent multiple letters to the IRS, submitted filings in Tax Court and to the Henderson County Appraiser's Office, emailed MyMail partners, and sent emails and other correspondence in their real estate dealings. All such correspondence, if offered by the Government, is admissible as a statement of a party opponent.

B.  Co-Conspirators Statements

Furthermore, statements made by co-conspirators in furtherance of a conspiracy are not hearsay. Fed. R. Evid. 801(d)(2)(E). In order for a co-conspirator statement to be admitted as non-hearsay the government, as the party seeking to admit the statement, must prove by a preponderance of the evidence "(1) the existence of a conspiracy, (2) [that] the statement was made by a co-conspirator of the party, (3) [that] the statement was made during the course of the conspiracy, and (4) [that] the statement was made in furtherance of the conspiracy." *United States v. Delgado*, 401 F.3d 290, 298 (5th Cir. 2005) (quoting, among other cases, *United States v. Robinson*, 367 F.3d 278, 291–92 (5th Cir. 2004)).

C.  Defendants' Admission of his Own Out-of-Court Statements

Although the Government may offer statements by the Defendants as admissions, the Court should preclude the Defendants from seeking to introduce their out-of-court statements into evidence. It is well-established that such statements are hearsay pursuant to Rule 801, and are not "admissions by a party opponent" pursuant to Rule 801(d)(2) when offered by the party himself, rather than the party's "opponent." *See United States v. Sanjar*, 853 F.3d 190, 204 (5th

Cir. 2017).  Accordingly, the Court should preclude the Defendants from seeking to introduce their own out-of-court statements.

### D.  Documentary Evidence

Although the government expects that the Defendants will stipulate to the admissibility of many of the documents discussed below, the government will briefly address their admissibility notwithstanding anticipated stipulations.

### 1.  Business Records

The government intends to introduce business records in its case-in-chief. These records include bank account records, vehicle loan and payment records from VW Credit, Inc., gold transaction records and correspondence from Dillon Gage (the precious metals dealer), IRA records and correspondence from Equity Trust, electric company records from Trinity Valley Electric Company, real estate transactions records and correspondence from United Country, Republic Title of Texas, and Infinite Title Solutions. These documents are records of a regularly conducted activity pursuant to Fed. R. Evid. 803(6) and thus are an exception to the rule excluding hearsay.

Business records are generally admissible as an exception to the hearsay rule. Fed. R. Evid. 803(6). The party seeking to admit the records must show, either through a live witness or a certification that complies with the requirements of Rule 902(11) that: (1) the record was made at or near the time by, or from information transmitted by, a person with knowledge; (2) the record was kept in the course of a regularly conducted business activity; and (3) it was the regular practice of that business activity to make the record. *United States v. Ned,* 637 F.3d 562, 569 (5th Cir. 2011). "There is no requirement that the witness who lays the foundation for the admission of a record under the business records exception of the hearsay rule be the author of

the record or be able to personally attest to its accuracy." *United States v. Armstrong,* 619 F.3d 380, 384-85 (5th Cir. 2010). Instead, a proper witness is one who can explain the record-keeping system of the organization and attest that the requirements of the business records exception are met. *United States v. Jones,* 554 F.2d 251, 252 (5th Cir. 1977).

Rather than calling various custodians of records to testify, the government plans to admit the evidence as self-authenticating pursuant to Rule 902(11). These records were made available to the defense in discovery and appropriate certifications have been provided. Consistent with Rule 902(11)'s requirements, the government provided notice of its intent to proceed in this matter on June 26, 2019.

### 2.   Certified Copies of Public Records

The government anticipates offering into evidence a number of certified copies of certain public records, including: MyMail formation documents from the Secretary of State; Tax Court, District Court for the Eastern District of Texas and Fifth Circuit filings, opinions and judgments; land records from Henderson County; records from the Henderson County Appraiser's Office; and certification of Green's bar license from the State Bar of Texas. Certified copies of public records require no extrinsic evidence of authenticity for admissibility. *See* Fed. R. Evid. 902 (1), (2), (4); *see also* Fed. R. Evid. 803(8) (public records), (14) (interest in property).

### 3.   IRS Service Center Records

The government intends to offer documents from the IRS Service Center through an IRS witness. These documents will include the Selgases' tax history from 1998 to the present, Green's tax history from 2000 to the present, records from the IRS exam files for both Thomas and Michelle Selgas for 1998 through 2002 and 2005, MyMail 2005 tax returns and related audit papers, letters sent to and from the Selgases and Green, and other IRS records, which are

admissible under Rules 803(6), (8) and 902(4), (11). During the IRS witness's testimony, the government also intends to offer certificates of lack of records for Green and the Selgases, which are admissible under 803(10) and 902(4), (11).

4.   Documents from Search Warrant

The government intends to offer certain documents that were recovered from an executed search warrant in 2004 at the office of American Rights Litigators ("ARL"). Thomas Selgas was a client of ARL; client number 82. During a search of the office of ARL, Thomas Selgas' client file was seized. The government intends to offer into evidence materials found within Thomas Selgas' client file including: (1) IRS Notices of Deficiencies from 1997-2001 for both Thomas Selgas and Michelle Selgas; (2) letters from Financial Institutions regarding back-up withholdings; and (3) various correspondence from the IRS regarding the Selgases' position on taxes. The government intends to call former IRS Special Agent F. Cameron Lalli to authenticate the records. These are records are non-hearsay as they will be used to prove the Selgases' knowledge and receipt of the records.

5.   Photocopies

Many of the documents that the government intends to offer into evidence are photocopies of documents. Under Federal Rule of Evidence 1003, a duplicate, such as a photocopy, has the same status as an original, unless there is a genuine question as to the authenticity of the original, or it would be unfair to admit the duplicate in lieu of the original. The government does not anticipate that either of these exceptions will apply to any of the records introduced in this case.

14

E.   Charts and Summaries

As part of its case-in-chief, the government intends to offer a number of summary exhibits. Federal Rule of Evidence 1006 provides:

> A proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. The court may order the proponent to produce them in court.

Fed. R. Evid. 1006. Rule 1006 "allows for the admission of summaries when (1) the evidence previously admitted is voluminous and (2) review by the jury would be inconvenient." *United States v. Bishop,* 264 F.3d 535, 547 (5th Cir. 2001). "Summary evidence must have an adequate foundation in evidence that is already admitted, and should be accompanied by a cautionary jury instruction." *Id.* In order to minimize the risk of prejudice from such evidence, the defense must be afforded the full opportunity to cross-examine the sponsoring witness. *See id.*

The government intends to introduce summary charts under Rule 1006 to summarize the IOLTA bank account records, specifically to show transfers between the accounts and expenditures from the accounts. The government also intends to introduce summaries of the gold transactions at Dillon Gage. These charts will be particularly helpful for the jury to understand the scheme and the flow of funds throughout the accounts. This information was reported in the bank statements or the Dillon Gage records, which are admissible as business records pursuant to Rule 803(6) and have been certified as authentic pursuant under Rule 902(11). The summary charts will set forth the relevant data from the admissible records in a manner that will make the otherwise voluminous records more convenient for examination by the jury. The government has provided copies of the proposed charts to the Defendants.  Any additional charts or changes to the charts will be provided to counsel in advance of trial.

15

The government also intends to introduce summary charts under Rule 1006 to summarize the income tax liability for each year from 1998 through 2002 and 2005. The 1998 through 2002 tax liabilities are shown through the IRS Account Transcripts, IRS audit records and correspondence, Tax Court decisions and Fifth Circuit opinions. The 2005 tax liability will be calculated by IRS Revenue Agent Deborah Simmons and will be shown through the original MyMail Schedule K-1, the District Court Judgment, the Fifth Circuit Opinion, and other IRS records. The summary charts will set forth the relevant data from the IRS records in a manner that will make the otherwise voluminous records more convenient for examination by the jury. The United States has provided a copy of the proposed summaries to the Defendants' counsel.

The information included in each of these summary exhibits is derived from admissible evidence and from exhibits the government intends to introduce at trial. The government previously made available to the Defendants the documents underlying these summary charts. In addition, copies of these underlying documents will be marked as exhibits. The government will establish the accuracy of these summary charts through the testimony of the agent who has reviewed them. As such, the summary charts are properly admissible into evidence.

F.   Summary Witnesses

Federal Rule of Evidence 1006 "does not specifically address summary witnesses or summarization of trial testimony." *United States v. Nguyen*, 504 F.3d 561, 572 (5th Cir. 2007), quoting *United States v. Fullwood*, 342 F.3d 409, 413 (5th Cir. 2003).  The use of a summary witness has been generally upheld, especially in complex cases or where large number of exhibits may generate confusion for the jury. *United States v. Gray*, 507 F. 2d 1013, 1017-18 (5th Cir. 1975) (upholding government's use of expert summary witness in tax evasion case).

"Witness summaries do not, of themselves, constitute evidence in the case but only purport to summarize the documented and detailed evidence already submitted." *United States v. Lavergne*, 805 F.2d 517, 522 (5th Cir. 1986), *quoting United States v. Diez*, 515 F.2d 892, 905 (5th Cir. 1975). The Court should permit a full scope of cross-examination by the defense. *Id*.

In this case, the government will present an IRS Revenue Agent as a summary witness to summarize limited categories of evidence—not merely to recap for the jury evidence already presented. In particular, to assist the jury in the examination of the bank records, the precious metal records, the income tax records and other evidence that will be introduced to prove the charges in the indictment, the government intends to rely on IRS Revenue Agent Deborah Simmons. The agent will summarize the bank records and introduce summary charts that show the deposits into, and expenditures from, the IOLTAs. This testimony is necessary to show the flow of funds through the accounts to further the charged conspiracy in this case.

The government will also present the IRS Revenue Agent to present the calculation of the Selgases' tax debt. *See United States v.* Gray, 507 F. 2d at 1018 (the summary witness opinions "were not binding upon the jury but were meant to be helpful and were entitled to such weight as the jury might see fit to accord them; that the jury was bound by the judge's instructions as to the law, while the questions of criminal intent, willfulness, good faith and other questions of fact were left for the jury to determine."); *see United States v. Johnson*, 319 U.S. 503, 519 (1943).

G.  Rule on Witness Sequestration

The United States requests that the case agent and summary witness referred to in the previous subsection be exempted from Rule 615's sequestration as designated representatives of the United States. Fed. R. Evid. 615(2); *United States v. Alvarado*, 647 F.2d 537, 540 (5th Cir. 1981). The government requests that all other potential witnesses for both the United States and

17

the defense be excluded from the courtroom and prohibited from discussing the evidence introduced during the trial.

    H.  Expert Witnesses

    The government may call an expert witness to describe IOLTAs to the jury.  As disclosed in the government's notice under Fed. R. Crim. P. 16(a)(1)(G), the government may call James Ehler from the State Bar of Texas to describe the purpose and requirements of IOLTAs. Mr. Ehler is expected to testify that using IOTLAs to hide money from the government is an improper use of an IOLTA.

    In response to the government's notice, counsel for Green provided notice of his intent to call, as needed, Judge Overstreet to discuss IOLTAs. Counsel has promised a copy of Judge Overstreet's curriculum vitae (and first name), but as of the date of filing this brief, neither has been provided. Depending on Judge Overstreet's qualification and background, the government may file additional briefing on this issue.

    Furthermore, on September 4, 2019, counsel for Green sent notice to the government of his intent to call Dr. Glass if the court allows the admission of Green's tax filing history. On that same day, Green's counsel filed notice under seal with the Court. Notably, counsel for Green provided no report of examination, no bases for the opinion, nor a copy of Dr. Glass's curriculum vitae (or even a first name). *See* Fed. R. Crim. P. 16(a)(1)(F) and (G). The government has requested such materials, but as of the date of this filing, none have been provided. The government contends, among other things, that this notice is untimely and insufficient. The government will likely file additional briefing regarding this witness once defense provides the required information.

I.   Improper Use of Law Enforcement Reports of Interview

The discovery in this case includes numerous interview reports from the IRS. Such reports cannot be used as the basis to impeach witness testimony nor can they be published to the jury. Statements of witnesses, as set forth in interview reports, are not the statements written or adopted by the witnesses, and therefore cannot be used to impeach.

Law enforcement interview reports are not statements of the witness under the Jencks Act, which defines a statement as "a written statement made by said witness and signed or otherwise adopted or approved by him"; a recording or transcription that "is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously"; or a statement made by a witness to the grand jury. *See* 18 U.S.C. § 3500(e). The Supreme Court has held that "summaries of an oral statement which evidence substantial selection of material" or "statements which contain [an] agent's interpretations or impressions" are "not to be produced." *See Palermo v. United States*, 360 U.S. 343, 352-53 (1959).

Thus, the Defendants should be precluded from introducing the contents of the interview reports to impeach witnesses on the basis of inconsistent statements because the interview reports are not the statements of the witnesses themselves. Moreover, the Defendants should be precluded from publishing the contents of the interview reports to the jury, or otherwise suggesting to the jury that the interview report is a statement of the witness.

J.   Pending Motions *in Limine*

The United States filed, contemporaneously with this trial brief, a motion *in limine* concerning the admissibility of (1) anticipated defense exhibits that may cite the law or constitute improper interpretations of the law and (2) testimony as to lay witnesses' opinions about what the Defendants' purportedly believed.

Defense has filed motions *in limine* to exclude the Government's introduction of Defendant Green's filing history and similar dealings with other clients.

## V. CONCLUSION

The foregoing is a summary of some of the points that the government anticipates are likely to arise at trial.  Should any legal issues arise that are not covered in this trial brief, the government respectfully requests leave to submit further memoranda as necessary to assist the Court.

Respectfully Submitted,

ERIN NEALY COX
UNITED STATES ATTORNEY


*/s/ Mara A. Strier*

By:   ROBERT A. KEMINS
Massachusetts Bar No. 267330
Trial Attorney
U.S. Dept. of Justice, Tax Division
717 N. Harwood, Ste. # 400
Dallas, TX 75201
(214) 880-9781
Robert.A.Kemins@usdoj.gov

MARA A. STRIER
Florida Bar No. 644234
Trial Attorney
U.S. Dept. of Justice, Tax Division
150 M Street, NE
Mail Stop: 1.1505
Washington, DC 20002
(202) 514-5886
Mara.A.Strier@usdoj.gov

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on September 9, 2019, the foregoing document was filed using ECF, which will notify all counsel of record.

*/s/ Mara Strier*
Mara Strier
Trial Attorney
Tax Division, United States Department of Justice